UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROSEMARY REYES, et al, <br> *Plaintiffs,* <br> v. <br> OFFICER RICHARD GALPIN, et al, <br> *Defendants.* | Civil No. 3:18cv831 (JBA) <br><br> February 27, 2019 |

**RULING ON DEFENDANTS' MOTION TO DISMISS**

Rosemary Reyes, individually and in her capacity as executrix of the Estate of Daniel Reyes, brings suit against Defendants Officer Richard Galpin, Officer Keith Koval, Chief James Campbell, the Town of Thomaston, Connecticut, and the Thomaston Police Department for claims related to the death of her son, Daniel Reyes. Defendants move jointly to dismiss all counts of Plaintiff's complaint. For the reasons that follow, Defendants' Motion to Dismiss is granted in part and denied in part.

**I. Facts Alleged**

Plaintiff alleges that her son, Daniel Reyes, "was a young man with a well-documented history of serious, chronic mental-health issues." (Compl. [Doc. # 1] ¶ 10.) Mr. Reyes was "well-known to the Thomaston Police Department, and had had numerous interactions with" that department. (*Id.*)

On the night of June 26, 2016, Mr. Reyes "called 911 at approximately 7 p.m. and reported that lives were in danger at . . . the home he shared with his mother." (*Id.* ¶ 12.) "Following this call, Mr. Reyes gave his mother a kiss, told her he loved her, and exited the apartment. On his way out the door, he left a handwritten note on a table by the front door and picked up a black-handled kitchen knife." (*Id.*)

The 911 dispatcher then called back and spoke to Ms. Reyes, who reported "that there was no problem at the residence." (*Id.* ¶ 13.) Patrol officers were then dispatched to Plaintiff's address "to perform a safety check." (*Id.*)

Officer Keith Koval arrived first and "[h]aving observed the knife, . . . remained in his cruiser and made contact with [Daniel] Reyes, who challenged Koval to exit his cruiser and draw his weapon. Recognizing the danger of the situation and hoping to deescalate it, Koval declined to exit his vehicle and instead asked Mr. Reyes what was going on. Mr. Reyes responded that he would not talk to Koval until he exited his cruiser and drew his weapon. Koval responded by backing his cruiser up in order to create distance between himself and Reyes." (*Id.* ¶ 14.)

Officer Richard Galpin arrived on the scene "[w]hile Koval was in the process of deescalating the situation with Mr. Reyes." (*Id.* ¶ 15.) "Galpin exited his cruiser, and then locked it with a key fob that he tucked into his belt. He then heard Officer Koval report over his radio that Reyes was armed with a knife. Galpin saw the knife in Mr. Reyes's right hand and drew his firearm while commanding Reyes to stop and put the knife down." (*Id.*) Officer Galpin attempted to retreat into his police cruiser, but he was "unable to open the doors he had locked because the key fob was tucked into his belt." (*Id.* ¶ 16.) Officer Galpin again commanded Mr. Reyes to "stop and drop the knife, but Reyes appeared not to comply and told [Officer Galpin] to shoot him." (*Id.*) Officer Galpin "circled" his vehicle and "retreat[ed] to the front passenger side while Reyes continued to follow him." (*Id.*) Then, "[w]hile standing at the front passenger door" of his police vehicle, "Galpin fired a single shot from his .45 caliber handgun and felled Reyes where he stood near the rear passenger side of the vehicle. Mr. Reyes died shortly after being shot." (*Id.*)

2

Plaintiff Ms. Reyes was "inside her home while her son was slain" and was "helpless either to stop the shooting or to assist her son as he lay dying." (*Id.* ¶ 17.) Plaintiff was "unable to say goodbye or that she loved him before [her son's] death." (*Id.*)

**II. Discussion**

Count One of the Complaint claims that the officers used unreasonable force in killing Mr. Reyes, in violation of the Fourth Amendment and 42 U.S.C. 1983. (Compl. ¶¶ 18-26.) Count Two brings claims for failure to adequately train officers regarding the use of deadly force against individuals suspected of suffering from mental illness. (*Id.* ¶¶ 27-32.) Count Three brings claims under the Americans with Disabilities Act for failure to train regarding "how to make reasonable accommodations for persons suffering, or perceived to be suffering from, mental illness or disabilities when these persons are either arrested, taken into custody, or detained . . . ." (*Id.* ¶ 35.) Count Four alleges wrongful death under Connecticut state law. (*Id.* ¶¶ 39-40.) Count Six[1] brings claims for negligent infliction of emotional distress upon Ms. Reyes. (*Id.* ¶¶ 41-46.)

Defendants move to dismiss all claims of Plaintiff's complaint for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). Defendants argue that they are entitled to qualified immunity on all counts alleged in the Complaint and that the actions of the officers were objectively reasonable, entitling them to dismissal of Plaintiff's Complaint in its entirety. (Defs.' Mem. Supp. Mot. to Dismiss [Doc. # 22-1] at 5, 7.)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed

---

[1] The Complaint does not include a Count Five.

3

allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

### A. Claims against Officers Galpin and Koval

The doctrine of qualified immunity shields state officials from civil suit and liability for civil damages in actions brought under 42 U.S.C. § 1983, so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, in order for a plaintiff to overcome qualified immunity: (1) the facts alleged must make out a violation of a statutory or constitutional right, and (2) that right must have been "clearly established" at the time of the defendants' alleged misconduct. *See id.*[2] The immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). While there need not be a case

---

[2] The Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to analyze first, depending on the circumstances of the case. *See Pearson*, 555 U.S. at 236.

4

directly on point for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court explained,

> We have repeatedly told courts . . . not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal citations and quotation marks omitted). "Although [courts] generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right, the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Burns v. Martuscello*, 890 F.3d 77, 94 (2d Cir. 2018) (citations omitted).

"Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.' . . . Indeed, we have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery.'" *Pearson v. Callahan*, 555 U.S. 223, 231-232 (2009) (internal quotations omitted). The Supreme Court has therefore "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

However, the Second Circuit has noted that "motions to dismiss a plaintiff's complaint under Rule 12(b)(6) on the basis of an affirmative defense will generally face a difficult road." *Garcia v. Does*, 779 F.3d 84, 96–97 (2d Cir. 2015). "Not only must the facts supporting the defense

appear on the face of the complaint, but . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (internal citations omitted). "As a result of this standard of review, a defendant asserting a qualified immunity defense on a motion to dismiss faces a formidable hurdle and is usually not successful." *Barnett v. Mount Vernon Police Dept.*, 523 Fed. App'x 811, 813 (2d Cir. 2013) (internal quotation omitted).

Defendants argue that they are entitled to dismissal of the Complaint because the officers did not violate any clearly established law or constitutional protections and are therefore protected by qualified immunity. (Defs.' Mem. at 7.)

### i. Count One: Excessive Force

When an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-397.

The "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 308-309). "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby

provide an officer notice that a specific use of force is unlawful." *Id.* (quoting *Mullenix*, 136 S. Ct. at 312).

The sole issue at this stage therefore becomes whether Defendants can demonstrate, based only on the Complaint, that the officers did not violate any clearly established constitutional protections, even while drawing all reasonable inferences from the facts alleged in favor of Plaintiff. *See Graham*, 490 U.S. at 396-397. Defendants argue that several cases "pertaining to emotionally disturbed persons with knives" indicate that the officers' behavior was clearly within the scope of a reasonable officers' conduct, and therefore that their behavior did not violate any clearly established rights.

Defendants point especially to *Kisela,* in which the Supreme Court held that an officer was entitled to qualified immunity because his use of force did not violate clearly established law. In that case, officers responded to a report of a "woman engaging in erratic behavior with a knife" and, upon seeing a woman (Hughes) matching that description "walk[] toward" another individual (Chadwick) and "stop[] no more than six feet from her," three officers present drew their guns. 138 S. Ct. at 1150. The officers told Hughes to drop the knife "at least twice." *Id.* "Hughes appeared calm, but she did not acknowledge the officers' presence or drop the knife." One officer subsequently shot Hughes four times. *Id.* Officers had been on the scene "but a few minutes, perhaps just a minute" at the time of the shooting. *Id.* Hughes survived and sued the officer who shot her, claiming excessive use of force under the Fourth Amendment and § 1983.

The Supreme Court held in that case that it "need not, and does not, decide whether [the officer] violated the Fourth Amendment when he used deadly force against Hughes. For even assuming a Fourth Amendment violation occurred—a proposition that is not at all evident—on these facts Kisela was at least entitled to qualified immunity." 138 S. Ct. at 1152 (holding that "this

7

is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment"). The Supreme Court found no case(s) which would have made clear that the shooting violated any clearly established right, observing that "[i]n fact, the most analogous [Ninth] Circuit precedent favors" the officer, not Hughes. *Id.*

Defendants emphasize the similarities between the facts of *Kisela* and the circumstances of Mr. Reyes' death, such as the short duration of the officers' presence on the scene, the necessity of a quick response, the movement of an armed person towards another, and the subject's refusal to drop the knife following repeated police commands. Defendants argue that the Supreme Court's opinion in *Kisela* demonstrates that their similar behavior in a similar situation is also "at least entitled to qualified immunity."

Plaintiff argues that "at this stage, the Plaintiffs have pleaded sufficient facts to establish a plausible claim that it was objectively unreasonable for Officer Galpin to kill Reyes." (Pl.'s Opp. at 6.) Plaintiff cites Officer Koval's decision to remain inside his police vehicle as evidence that Officer Galpin's choice to exit the vehicle and engage with Mr. Reyes was objectively unreasonable. (*Id.*) Contrary to Plaintiff's assertion, that the two officers adopted a different approach does not clearly establish that one approach represented a constitutional violation. *See Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) ("an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." (internal quotation omitted)). Moreover, in focusing broadly on whether she established a "plausible claim that it was objectively unreasonable for Officer Galpin to kill Reyes," Plaintiff's argument misses the mark with regard to qualified immunity, failing to plead facts or cite any case which "'squarely governs' the specific facts at issue," *Kisela,* 138 S. Ct. at 1153, and which could

8

arguably clearly establish a right which Officer Galpin violated in shooting Mr. Reyes. In the absence of any "precedent involving similar facts" which could "help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful," Officers Koval and Galpin are entitled to the protections of qualified immunity on Count One. *Id.* (quoting *Mullenix*, 136 S. Ct. at 312).

    ii. **Counts Four: Wrongful Death and Six: Negligent Infliction of Emotional Distress**

In the absence of any federal claim against Defendants Koval and Galpin which survives Defendants' Motion to Dismiss, the Court must first determine whether to exercise supplemental jurisdiction over the state law claims against them in Counts Four and Six, which claim wrongful death and negligent infliction of emotional distress.

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy," 28 U.S.C. § 1367, i.e., that "derive from a common nucleus of operative fact," *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997) (internal quotation omitted). When only "state-law claims remain[] after resolution of the federal question, the District Court [has] discretion, consistent with Article III, to retain jurisdiction" over those still-pending state law claims. *Osborn v. Haley*, 549 U.S. 225, 245 (2007). *See* 28 U.S.C. § 1367(c)(3). "In general, where [all] federal claims are dismissed before trial, the state claims should be dismissed as well," *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir.1998), but the "district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). In exercising that discretion, district courts "must weigh various factors,

9

such as judicial economy, convenience, fairness, and comity." *Wright v. Musanti*, 887 F.3d 577, 582 n.2 (2d Cir. 2018).

In light of those factors, the Court declines to exercise supplemental jurisdiction over the state law claims against Defendants Koval and Galpin in Counts Four and Six. This case is still in early stages of litigation, so there has not yet been the type of "substantial expenditure in time, effort, and money in preparing the dependent claims" which would weigh in favor of an exercise of supplemental jurisdiction. *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994). *See Estate of Devine v. Fusaro*, 676 Fed. App'x 61, 64 (2d Cir. 2017) (affirming "district court's decision to decline to exercise jurisdiction over" state law claims after finding officers entitled to qualified immunity on § 1983 excessive force claim and entering summary judgment in their favor on federal claims); *Chapman v. Crane Co.*, 694 Fed. App'x 825, 829 (2d Cir. 2017) (affirming district court's declining to exercise supplemental jurisdiction where, among other factors, "it was still an early stage of the proceedings and discovery was not complete; [and] no dispositive motions had been decided"). All claims against Defendants Koval and Galpin are therefore dismissed.

### B. Claims against Chief James Campbell, the Town of Thomaston, and the Thomaston Police Department

The Complaint's failure to train claim (Count Two) and ADA violation claim (Count Three) bring claims against Chief James Campbell, the Town of Thomaston, and the Thomaston Police Department (together, the "Municipal Defendants").

i. **Thomaston Police Department as defendant**

Defendants argue that the "claims against the Thomaston Police Department should be dismissed because, under clearly established law, a police department is not a legal entity." (Defs.' Mem. at 3.) Defendants cite no authority for this argument, and in the absence of such, the

Thomaston Police Department will not be dismissed on those grounds. *See Soltis v. Kotenski*, 63 F. Supp. 2d 187, 189 (D. Conn. 1999) ("the Court will comment briefly on defendants' claims that a police department cannot be liable under Section 1983. This is not an accurate statement of the law. A municipality may be held liable, as may a municipality's police department, when plaintiff's harm was caused by a constitutional violation and where the municipality or police department as a subdivision thereof is responsible for that violation." (citing *Collins v. City of Harker Heights*, 503 U.S. 115 (1992))). *See also Thompson v. Mexico Const., LLC*, 2007 WL 763899, at *1 (D. Conn. March 9, 2007) (reviewing and finding no binding authority which clearly holds that police departments are improper defendants in Connecticut).

### ii. Count Two: Failure to Train

"In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978)).

The Supreme Court has interpreted § 1983's causation requirement as inconsistent with the imposition of vicarious or *respondeat superior* liability on a municipality for the torts of its employees, *Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007) (citing *Monell*, 436 U.S. at 691–94), and thus "[t]he fifth element—the 'official policy' element—can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort,'" *Roe*, 542 F.3d at 36 (quoting *Monell*, 436 U.S. at 691). "'In other words, a municipality may not be found liable simply because one of its employees committed a tort'" and "a plaintiff must demonstrate that,

11

through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Id.* at 36–37 (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). The Supreme Court has explained that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train" because municipal liability depends upon a showing of policymakers' "deliberate indifference" to citizens' rights rather than negligence. *Id.* Therefore, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," because "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 1360.

To survive Defendants' Motion to Dismiss, Plaintiff must have pled facts which, if true, would state a claim for the Municipal Defendants' liability for failure to train: first, that Mr. Reyes suffered a constitutional violation, and second, that the Municipal Defendants' "deliberate indifference" and failure to train "caused" that violation.

First, though Plaintiff has not plausibly pled facts or cited any cases which suggest that Officers Koval and Galpin violated any *clearly established* constitutional rights, the Complaint does contain sufficient factual allegations which, in combination with all favorable inferences to which Plaintiff is entitled at this stage, render a claim of Fourth Amendment violation facially plausible. Though that alone is insufficient to defeat the officers' claim of qualified immunity, it does allow Plaintiff's failure to train claim against the Municipal Defendants to proceed at this stage.

12

Second, Plaintiff here contends that, in the Thomaston Police Department, "[o]fficers were not trained to apprehend those suffering from a current mental illness, or those perceived as disabled, and those for whom officers had a record of psychiatric impairment." (Compl. ¶ 29.) The Complaint also alleges that the Thomaston Police Department "responds regularly to calls for individuals who, based upon initial reports to officers, are believed to be seriously disturbed, either as a result of illness or intoxication. The department fails, refuses, and neglects to keep a centralized database of those reported to it as suspected of being mentally ill." (*Id.* ¶ 30.) Plaintiff also alleges that Chief Campbell "did not provide training necessary for officers faced with the challenge of bringing such people safely" into their custody, despite being "on notice . . . that a significant number of individuals arrested or otherwise detained by officers . . . are either mentally ill or appear to be so." (*Id.* ¶ 31.) Nonetheless, the Complaint alleges, "the Chief refused, failed and neglected to provide training on how safely, and without precipitous use of deadly force, to defuse a tense situation and place an agitated person in custody." (*Id.*)

These allegations, if true, suggest that policymakers arguably had actual or constructive notice of the need for such training and that a policymaker demonstrated deliberate indifference to that need, and therefore Plaintiff states a facially plausible claim for relief for failure to train sufficient for Count Three to survive the motion to dismiss stage. *See Amnesty America v. Town of West Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004) (plaintiff not required to "identify a specific deficiency" in training "at the motion to dismiss stage" but must do so to survive a motion for summary judgment).

### iii. Count Three: ADA Violation

13

Plaintiff also argues that Defendants[3] violated Mr. Reyes' rights under the Americans with Disabilities Act, 42 U.S.C. § 12132 et seq., by their failure to offer training "on how to make reasonable accommodations for persons suffering, or perceived to be suffering from, mental illness or disabilities when these persons are" taken into custody.[4]

To establish a violation of the ADA, Plaintiff must demonstrate (1) that Mr. Reyes was a "qualified individual" with a disability; (2) that the Defendants are subject to the ADA; and (3) that Mr. Reyes was denied the opportunity to participate in or benefit from the Defendants' services, programs, or activities, or was otherwise discriminated against by Defendants by reason of his disability. *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196–97 (2d Cir. 2014) (citing *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)).

Defendants do not appear to contest that Mr. Reyes was a "qualified individual" or that they are generally subject to the ADA. (*See generally* Defs.' Mem.)

Defendants argue instead that "officers making an arrest are not required to first determine whether their actions would comply with the ADA before protecting themselves and others," (Defs.' Mem. at 16 (citing *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000)), and therefore that Mr. Reyes suffered no underlying ADA violation which would support an ADA failure to train claim. The *Hainze* court determined that "Title II does not apply to an officer's on-the-street responses

---

[3] Because Count Three of the Complaint identifies only the Town of Thomaston and the Thomaston Police Departments as responsible for the alleged ADA violation, (Compl. ¶¶ 35-37), the Court reads Count Three as brought only against those two defendants.

[4] In her Opposition to the Motion to Dismiss, Plaintiff analyzes Count Three's claims both under the ADA and under *Monell* and § 1983. (Pl.'s Opp. at 10-12.) However, on the face of the Complaint, Count Three brings only a claim of violation of the ADA and makes no reference to § 1983. (Compl. ¶¶ 33-38.) Therefore, the Court treats Count Three as only a claim for violation of the ADA.

14

to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life," reasoning that to "require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to" ensuring the safety of those present "would pose an unnecessary risk to innocents." *Hainze*, 207 F.3d at 801.

However, that approach of the Fifth Circuit Court of Appeals has been adopted neither by the Second Circuit Court of Appeals nor by district courts within this circuit who have considered whether the ADA applies to interactions between law enforcement and disabled individuals. In *Williams v. City of New York*, 121 F. Supp. 3d 354, 364-365 (S.D.N.Y.), that district court held that the ADA does govern "on-the-street encounters" between police and covered individuals, concluding that "the City's crabbed interpretation of Title II's coverage of police activity simply does not comport with the language of Title II and its implementing regulations, particularly in light of the remedial purpose of the statute and the weight of authority that has considered the issue." The *Williams* court reasoned that

> 'Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights' and 'a pattern of unequal treatment' in a wide range of public services and activities 'in the administration of justice.' [*Tennessee v. Lane*, 541 U.S. 509, 524-525 (2004).] The Department of Justice's implementing regulations for the ADA make clear that, with exceptions not relevant here, Title II of the ADA 'applies to all services, programs, and activities provided or made available by public entities,' 28 C.F.R. § 35.102(a), and requires public entities to make 'reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability,' unless the required modification would fundamentally alter the nature of the service, program, or activity, 28 C.F.R. § 35.130(b)(7). The phrase 'services, programs, or activities' is 'a catch-all phrase' that prohibits all discrimination by a public entity. *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 69 (2d Cir. 2012) (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997), recognized

15

as superseded on other grounds, *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n. 7 (2d Cir. 2001)). As the Second Circuit has explained, the ADA should be 'broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.' *Id.* at 68 (quotation marks and citation omitted).

A number of courts have considered whether interactions between law enforcement and disabled individuals—whether initiated by the disabled individual or the police and whether the interaction culminates in an arrest—are 'services, programs, or activities' subject to the requirement of accommodation under Title II of the ADA. Those courts have generally found that Title II applies, but the reasonableness of the accommodation required must be assessed in light of the totality of the circumstances of the particular case.

121 F. Supp. 3d at 365-366.

That court went on to conclude that there are "at least two types of Title II claims applicable to arrests," including "(1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.* at 369 (quoting *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds*, 135 S.Ct. 1765 (2015) ("Whether the statutory language [of the ADA] applies to arrests is an important question that would benefit from briefing and an adversary presentation. But San Francisco, the United States as *amicus curiae*, and Sheehan all argue (or at least accept) that § 12132 applies to arrests. No one argues the contrary view. As a result, we do not think that it would be prudent to decide the question in this case.")).

It is clear, at least, that the ADA can apply to police activity in some situations. Even *Hainze v. Richards*, the sole case cited by the Defendants in support of their proposition that Officers Koval

16

and Galpin were not required to consider ADA compliance before acting, acknowledges that police actions must, at some point, begin to comply with ADA requirements. 207 F.3d at 802 ("Once the area was secure and there was no threat to human safety, the . . . deputies would have been under a duty to reasonably accommodate Hainze's disability in handling and transporting him . . . ."). *See Brunette v. City of Burlington, Vermont*, 2018 WL 4146598, at \* 34 (D. Vt. Aug. 30, 2018) (holding that "exigent circumstances" of the police encounter must be considered in determining whether police provided ADA-compliant "reasonable accommodation" and citing cases taking similar approach).

Plaintiff further alleges that Chief Campbell was "on notice . . . that a significant number of individuals arrested or otherwise detained by officers under [his] employ are either mentally ill or appear to be so" and that it "was foreseeable to the Chief that police officers would routinely confront" such individuals, (Compl. ¶ 31), but that the Defendants nonetheless "offer no training on how to make reasonable accommodations" for individuals protected by the ADA with whom officers come into contact, (Compl. ¶¶ 35-36.)

Without yet deciding the precise scope of the ADA's requirements in this situation, the Court finds that Plaintiff has pled facts which render plausible her allegation that Mr. Reyes suffered a violation of his right to a reasonable accommodation of his disability because of an alleged failure to train and despite Defendants' knowledge of the need for such training. Therefore, Count Three states a claim of ADA violation sufficient to survive the motion to dismiss stage.

### III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. # 22] is GRANTED in part and DENIED in part. Counts One, Four, and Six of the Complaint are dismissed from this litigation, as are Defendants Officers Koval and Galpin. Counts Two and Three of the Complaint are not dismissed, nor are the Municipal Defendants.

IT IS SO ORDERED.

/s/
_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 27th day of February 2019.