UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROSEMARY REYES, personally and as the Executrix of the Estate of Daniel Reyes,<br>    *Plaintiff*,<br><br>    *v.*<br><br>TOWN OF THOMASTON, THOMASTON POLICE DEPARTMENT, and CHIEF JAMES CAMPBELL, in his official capacity,<br>    *Defendants*. | Civil No. 3:18-cv-831 (JBA)<br><br>September 30, 2020 |

**RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Rosemary Reyes brings claims on behalf of the estate of her son Daniel Reyes against Defendants Thomaston Police Department, Town of Thomaston ("Town"), and Chief of Police James Campbell. She alleges Defendants' failure to train Thomaston's police officers on handling mentally disturbed people as required under 42 U.S.C § 1983 (Count Two) and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 (Count Three) resulted in the death of Daniel Reyes during a police safety check. Defendants move for Summary Judgment [Doc. # 33] on both counts.

## I.  Undisputed Facts

Daniel Reyes "was a young man with serious, chronic mental health issues." (Ex. A (Report of the New Britain State's Attorney) to Defs.' Mot. for Summ. J. [Doc. # 33-3] at 5.) He "had a lengthy history of psychiatric hospitalizations, including recent inpatient hospitalizations[, and] suffered from command auditory hallucinations, anxiety, psychosis and paranoia." (*Id.*) He had stopped taking his psychiatric medications and had "been acting strangely during the time immediately prior to this incident." (*Id.*) Thomaston Police Department had, on at least one occasion, previously responded to Mr. Reyes's address to

take him to the hospital "for psychological reasons." (Parties' L.R. Stmts. of Add'l Mat. Facts [Docs. # 40-1, 43-1] ¶ 10.)

On the evening of June 26, 2016, Mr. Reyes was at his home with his mother. (Parties' L.R. Stmts. [Docs. ## 33-2, 40-1] ¶ 1.) At approximately 7:00 p.m., Mr. Reyes called 911 to report that "lives were in danger at 700 High Street Extension, Apt. A, the home which he shared with his mother." (*Id.*) Immediately after the call, Mr. Reyes left a handwritten note on a table by the front door, picked up a kitchen knife, and exited the apartment. (*Id.*)

The 911 dispatcher called back to the number from which Mr. Reyes had made his call. (*Id.*) Ms. Reyes answered and reported that "there was no problem at the residence." (*Id.* ¶ 2.) However, two patrol officers, Richard Galpin and Keith Koval, were dispatched to the address to perform a safety check. (*Id.*) The dispatcher informed both officers over the radio that "she had made telephone contact with the female at the residence, who stated . . . that there was no problem there." (*Id.*)

Officer Koval arrived at the residence first and recognized Mr. Reyes. (*Id.* ¶ 4.) He observed Mr. Reyes standing in the driveway with a knife in his hand and did not leave his vehicle. (*Id.*) Mr. Reyes told Officer Koval to get out of his vehicle twice and challenged him to draw his weapon. (*Id.*) Officer Koval answered, "No, tell me what's going on, are you having problems with your mother again?" (Parties' L.R. Stmts. Add'l ¶ 5.) Throughout the interaction, Officer Koval "never drew his service firearm" and "only drew his Taser, which he never fired." (*Id.* ¶ 7.)

Officer Galpin arrived at the residence approximately thirty seconds later and "exited his cruiser and then locked it with a key fob that he tucked into his belt." (Parties' L.R. Stmts. ¶¶ 3, 5.) As Officer Galpin was walking towards the parking area, Officer Koval reported over the radio that Mr. Reyes was armed with a knife. (*Id.*) When Officer Galpin saw Mr. Reyes walk towards him from the parking area, he drew his firearm. (*Id.*) Officer Galpin did not

draw his department-assigned taser at any time during his encounter with Mr. Reyes. (Parties' L.R. Stmts. Add'l Facts ¶ 8.)

Officer Galpin attempted to retreat into his cruiser and "instructed Reyes multiple times to drop the knife and stop." (Parties' L.R. Stmts. ¶ 8.) Mr. Reyes continued to advance towards Officer Galpin, telling the officer to shoot him and even "poked himself in the forehead saying, 'do it' ,[sic] pointing to his forehead, 'put it right there.'" (*Id.* ¶¶ 7-8.) Officer Galpin tried to get back into his cruiser, but he "was unable to open the doors he had locked because the key fob was tucked into his belt." (*Id.* ¶ 7.) As Officer Galpin circled around his cruiser, he eventually stopped because "there was a tall, long row of thick bushes behind [him], as well as a utility pole." (*Id.* ¶ 9.) Mr. Reyes was approximately eight to ten feet away from Officer Galpin and fifteen feet from Officer Koval when Officer Galpin fired the single shot that killed him. (*Id.* ¶¶ 10, 11.)

From 2003 until the incident on June 26, 2016, the Thomaston Police Department had responded to approximately twenty-eight calls involving Mr. Reyes and/or his mother, Rosemary Reyes. (*Id.* ¶ 12.) However, the Thomaston Police Department had no protocols or procedures regarding how to properly log information on addresses with persons who are mentally disturbed. (Parties' L.R. Stmts. Add'l Facts ¶ 16.) Prior to Mr. Reyes's death, there were no discussions or plans "on whether more training was needed to adequately prepare officers to interact with emotionally disturbed people." (*Id.* at 12.)

Plaintiff asserts two claims against the Town of Thomaston, Thomaston Police Department, and Chief James Campbell in his official capacity. In Count Two, Plaintiff brings a § 1983 claim for failure to train regarding the use of deadly force involving individuals presenting as mentally ill. In Count Three, Plaintiff brings a claim for violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et. seq.*, in Defendants' providing of police services.

## II. Standard of Review

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *William v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id.* at 272-273 (citing *Celotex*, 477 U.S. at 323). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* (citing Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

"Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.* (citing *Celotex*, 477 U.S. at 324; *Matsushita*, 475 U.S. at 586).

### III. Discussion

Plaintiff asserts the liability of the Defendants under 42 U.S.C. § 1983 (Count Two) and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (Count Three). In both counts, Plaintiff argues that the Town failed in its duty to properly train its officers on how to respond to individuals with mental disabilities. Each statute has distinct standards under which a failure to train claim should be analyzed. Defendants' motion for summary judgment under the ADA (Count Three) will be examined first, followed by discussion of the § 1983 claim (Count Two).

### A. Count Three: Discrimination Under Title II of the Americans with Disabilities Act

Plaintiff maintains that Defendants violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, by failing to offer "training on how to make reasonable accommodations for persons suffering, or perceived to be suffering from, mental illness or disabilities when these persons are either arrested, taken into custody, [] detained incident to a complaint of criminal or suspicious behavior[,] . . . [or] when responding to a 911 call." (Pl.'s Compl. [Doc. # 1] ¶¶ 35-36.). Defendants do not dispute that they had such a duty, but rather move for summary judgment because any accommodation of Mr. Reyes would have been *per se* unreasonable.  (Defs.' Mem. in Support of Mot. for Summ. J. [Doc. # 33-1] at 17, 22.)

To prove liability under the ADA, a plaintiff must demonstrate that "(1) he is a qualified individual under the ADA; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public

entity; and (3) that such exclusion or discrimination was due to his disability." *Brunette v. City of Burlington, Vt.*, 2018 WL 4146598, at *32 (D. Vt. 2018) (quoting *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003)) (emphasis added). Discrimination includes the "failure to make a reasonable accommodation." *Tsombanidis v. West Haven Fire Dep't,* 352 F.3d 565, 573 (2d Cir. 2003). In compliance with regulations of the Department of Justice ("DOJ"), the state of Connecticut requires municipalities to train their police officers on how to reasonably accommodate mentally ill individuals in the course of investigation and arrest. ." Conn. Gen. Stat. Ann. § 7-294r (2018). Thus, Plaintiff must prove that Defendants' failure to train its officers in handling mentally disabled people resulted in an exclusion of Mr. Reyes from police services necessary to accommodate his mental disability.[1]

---

[1] Defendants make a number of statements suggesting that Officer Galpin's duty to accommodate did not extend to Mr. Reyes. They argue that there is "no evidence that the officers had knowledge that the call involved an emotionally disturbed person," (Defs.' Mem. at 18), and that "[a] necessary predicate of an ADA claim is the officers' knowledge of the person's actual or perceived disability," (*Id.* at 21). Defendants further assert that Officer Galpin could not reasonably accommodate Mr. Reyes because "there [was] no time or opportunity to provide accommodations before or after self-defense [became] imperative," (*Id.* at 17-18), implying that a categorical exception exists for "the immediate threat doctrine and exigent circumstances" under the ADA. (Defs.' Mem. at 25.) However, Defendants conflate the applicability of the training duty with the nature of a reasonable accommodation required in specific circumstances. There is no established categorical exception for police officers' on-the-scene encounters under Title II. While the Second Circuit has not expressly addressed the issue, five circuits have concluded that that Title II applies to arrests and examines the threatening or exigent nature of the circumstances as part of the reasonableness of the officer's accommodation. See *Sheehan v. City & Cty. of San Francisco, Cal.*, 743 F.3d 1211, 1232 (9th Cir. 2014) ("We agree with the majority of circuits to have addressed the question that Title II applies to arrests") (cert. granted then dismissed as to whether Title II applies to arrests because "San Francisco, the United States as amicus curiae, and Sheehan all argue (or at least accept) that § 12132 applies to arrests" (*City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 600 (2015))); *Haberle v. Troxell*, 885 F.3d 170, 180 (3d Cir. 2018) ("police officers may violate the ADA when making an arrest by failing to provide reasonable accommodations for a qualified arrestee's disability"); *Waller ex rel. Estate of Hunt v. Danville, Va.*, 556 F.3d 171, 175 (4th Cir. 2009) (assuming that officers have the duty to reasonably accommodate while making an arrest, but finding against plaintiff because the requested accommodation was unreasonable); *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1085 (11th Cir. 2007) (holding that the exigent circumstances of police activity go more to the reasonableness argument than the categorical application of Title II to

### 1. *Failure to Train Under Title II of the ADA*

Plaintiff alleges that "the officer who fatally shot the Plaintiff's son likely did not have the requisite basic re-training mandated by Connecticut law. The lack of that training caused Plaintiff's son's death by rendering the officer ill-equipped to accommodate the Plaintiff's son's disability." (Pl.'s Mem. in Opp. [Doc. # 40] at 1.) Defendants present Officer Galpin's training records to demonstrate that, prior to 2016, he had received training, none of which was on the topic of reasonable accommodation of mentally distressed individuals. (Defs.' Reply [Doc. # 43] at 16-17; Ex. I (Galpin's Training Records) to Defs.' Reply [Doc. # 43-2] at 2, 11, 16-22.)[2] They also offer Chief Madden's testimony that "each of the officers on duty in Thomaston" received training, consisting of a few hours, without a written curriculum, on "how to talk with [mentally distressed individuals], how to deescalate circumstances, [and] how to not touch them," to demonstrate that the Town adequately trained its officers on how to properly handle mentally distressed individuals. (Ex. A (Dep. Of Chief Madden) to Pl.'s Opp. [Doc. # 40-2] at 27-29.)

---

arrests); *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) ("this court merely clarifies that a broad rule categorically excluding arrests from the scope of Title II . . . is not the law"). Two district courts in the Second Circuit have also found an obligation on law enforcement officers to reasonably accommodate under Title II. *See Brunette*, 2018 WL 4146598, at *32 (holding that even though the deceased "charged" the officer with a four-foot long pointed shovel, the officers were still required "to reasonably accommodate the person's disability in the course of investigation or arrest"); *Williams v. City of New York*, 121 F. Supp.3d 354, 368 (S.D.N.Y. 2015) ("The only reasonable interpretation of Title II is that law enforcement officers who are acting in an investigative or custodial capacity are performing 'services, programs, or activities' within the scope of Title II"). *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000), on which Defendants' rely, holding that Title II is categorically inapplicable to police officers "on-the-scene responses" until the scene has been secured because exigent circumstances are presumed to be present, appears to be an outlier.
[2] Officer Galpin seems to have attended a concentrated week of recertification classes in May of 2015, during which he received training on everything from "social networking" to "bias free policing (racial profiling)" to "sexual abuse/minimal facts." (Ex. I to Defs.' Reply at 16.) None of the fourteen classes he took in the five-day period pertained to mentally ill individuals.

Connecticut law mandates that, as of October 1, 2014, "each review training program" conducted "by a municipal police department in the state shall include a course on handling incidents involving an individual affected with a serious mental illness." Conn. Gen. Stat. Ann. § 7-294r (2018). This state training mandate is a means of operationalizing DOJ regulations that require municipalities to "make reasonable modifications in policies, practices, or procedures . . . to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)).[3] The importance of this training obligation was underscored in the State's Attorney's investigative report prepared in response to this fatal shooting. (Ex. A to Defs. Mot. for Summ. J. [Doc. # 33-3] at 10-12.) The State's Attorney found it "difficult to ignore the prevalence of encounters between emotionally disturbed individuals and police officers" in the state, and highlighted that "an individual suffering from mental illness is sixteen times more likely than someone not suffering from mental illness *to be killed* during a police encounter." (*Id.* at 12) (emphasis added). The report also details seven separate incidents in Connecticut in which mentally disabled individuals were killed by police while experiencing a psychotic episode since 2001. (*Id.*) The death of Daniel Reyes is now eighth on that list.

Municipalities' Title II ADA failure to train liability has been broadly recognized. *See Gohier,* 186 F.3d at 1222 (observing that plaintiff should have argued "that Title II required [the municipality] to better train its police officers to recognize reported disturbances that

---

[3] Improved training, particularly of police officers, was specifically contemplated by the drafters of the ADA. A 1990 report by the House Judiciary Committee found that "persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid for seizures." Robyn Levin, *Responsiveness to Difference: ADA Accommodations in the Course of an Arrest*, 69 STAN. L. REV. 269, 295 (2017) (quoting H.R. REP. NO. 101-485, pt. 3, at 50 (1990)). In an explanatory appendix, the DOJ further clarified that the "obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities. [L]aw enforcement personnel [are] required to make appropriate efforts to determine whether perceived strange or disruptive behavior [] is the result of a disability." 28 C.F.R. § Pt. 35, App. B.

are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability"); *Felix v. City of New York*, 344 F. Supp. 3d 644, 666 (S.D.N.Y. 2018) ("Plaintiffs have plausibly alleged that the City failed to train officers with respect to the treatment of individuals with mental illness, including but not limited to implementing Crisis Intervention Training, backup calls, and similar policies"); *Buben v. City of Lone Tree*, No. 08-CV-00127-WYD-MEH, 2010 WL 3894185, at *12 (D. Colo. Sept. 30, 2010) (denying the city's motion for summary judgment on failure-to-train because "the alleged non-compliance with the training requirements of the ADA . . . occurred [] when the Defendant policymakers failed to institute policies to accommodate disabled individuals such as Plaintiff by giving the officers the tools and resources to handle the situation peacefully") (quoting *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 238 (M.D.Pa. 2003)); *Jackson v. Inhabitants of Town of Sanford*, No. CIV. 94-12-P-H, 1994 WL 589617, at *6 (D. Me. Sept. 23, 1994) (denying defendants' summary judgment on a failure to train claim because the ADA "clearly applies" to "unjustified arrests of disabled persons"). The Town of Thomaston, under Title II of the ADA, unquestionably has the affirmative duty to instruct its police officers on how to recognize and properly respond to mentally ill individuals in the course of their investigations and arrests.

Chief Madden asserted "with confidence" that "each of the officers on duty in Thomaston" received training, consisting of a few hours, without a written curriculum, on "how to talk with [mentally distressed individuals], how to deescalate circumstances, [and] how to not touch them," as required by Conn. Gen. Stat. Ann. Section 7-294r. (Ex. A to Pl.'s Opp. at 27-29.) However, the Town offers no evidence describing the nature or content of such training. No documentation, dates, or titles of trainings were proffered, and no

testimony was offered by any witness to show what training was implemented by the Town. (*Id.* at 14.) With respect to Officer Galpin's training during his ten-year career in the Thomaston Police Department, the Town points to one three-hour course on "hearing voices that are distressing" that Officer Galpin attended in 2009. (Ex. B (Galpin's Training Records) to Pl.'s Mem. in Opp. [Doc. # 40-3] at 5; Ex. A to Pl.'s Mem at 19-20.)[4] Whether the Town offered adequate training but failed to administer it properly to each officer or simply failed to regularly provide training at all remains a genuine issue of material fact that precludes finding summary judgment.

### 2. Whether Defendants' Failure to Train Resulted in the Death of Mr. Reyes

Defendants claim that no accommodation of Mr. Reyes was possible under the circumstances.[5] Alleging that "[t]he undisputed facts in Reyes show that he was armed prior

---

[4] In 2006, 2008, and 2011, Officer Galpin received training in the general "human relations" department, but the record does not reflect if that training particularly discussed handling mentally distressed individuals. (Ex. A to Pl.'s Opp. at 23-26; Ex. B to Pl.'s Opp. at 2, 10).

[5] As detailed in n. 1, there is no categorical exception for police responding to exigent circumstances under Title II of the ADA. Defendants fail to recognize that the exigent circumstances and direct threat theories do not apply to a municipal failure-to-train claim, which precedes the untrained on-the-scene encounter. *See Buben*, 2010 WL 3894185, at *12 (holding that "the exception identified in *Hainze* and other cases for officers facing exigent circumstances does not apply to this ADA claim" because "[p]laintiff's have brought their ADA claim against the Commission for failing to properly train those officers"). The Town was required to train its officers to respond to exigent circumstances. Plaintiff alleges that they failed to properly do so here, resulting in the death of Mr. Reyes.

Defendants further argue that an officer's prior knowledge of a disability is a prerequisite to an officer's duty to accommodate. This is also misplaced. If law enforcement's prior knowledge of the individual's disability is considered at all, it is in the context of the reasonableness of the accommodations available. *See Brunette*, 2018 WL 4146598 at *33; *Sheehan*, 743 F.3d at 1233. Plaintiff's theory is that if the Town had properly trained its officers, Officer Galpin could have identified Mr. Reyes's mental disability as animating his conduct and could have employed de-escalation techniques, not simply responded with deadly force. Mr. Reyes is not required to notify the police that he is mentally ill before being entitled to reasonable accommodation. The requirement to reasonably accommodate mentally disabled individuals applies to the entire mentally disabled population, not just

to the officers' arrival and immediately threatened Officer Galpin and continued to attack him during the moment before the shooting," Defendants argue that "neither officer had the time or opportunity to analyze Mr. Reyes's mental health issues or to exercise reasonable accommodations that would have changed the outcome of this case." (Defs.' Mem. at 27.)

Plaintiff challenges the "undisputed" nature of these facts, pointing to Officer Koval's reaction to and treatment of Mr. Reyes to demonstrate that there clearly was enough time and space for at least one of the officers to analyze Mr. Reyes's mental health condition and respond appropriately.  (Pl.'s Opp. at 19). Even once Officer Galpin made the decision to get out of his car, lock it, and place the fob in his belt, Plaintiff offers the eyewitness statement of Scougall as evidence that Mr. Reyes presented no immediate threat to Officer Galpin as Mr. Reyes was walking "slowly" and, while armed, had "both arms extended." (*Id.* at 21.; *see also* Ex. D (Scougall Stmt.) to Defs.' Mot. for Summ. J. [Doc. 33-5] at 2.) Moreover, Plaintiff points to "Reyes begg[ing Galpin] to shoot him," (Pl.'s Opp. at 21), "pok[ing] himself in the forehead saying, 'do it,' pointing to his forehead, 'put it right there,'" (Parties' L.R. ¶ 8), as demonstrating his emotional disability and absence of threat to Officer Galpin. Plaintiff argues that Mr. Reyes's erratic behavior was perceived as threatening only because the Town

---

previously identified individuals. *See Williams*, 121 F. Supp. 3d at 375 ("it would be preposterous to believe that given the diversity of the population in the City of New York, the NYPD did not know full well that its officers would encounter persons with [mental disabilities] in connection with protecting and defending the City and that some of those people would need accommodation in order to interact with the police"); *Haberle*, 885 F.3d at 179 ("Like the overall population, the subset of people who violate the law, or are suspected of such, will naturally include those with recognized disabilities."). An important part of the required training is recognition of mental disability that might not otherwise be immediately obvious. Defendants' attempt to relieve Officer Galpin from his duty to accommodate based on lack of prior knowledge, exigent circumstances, or direct threats finds little support in Second Circuit jurisprudence and does not form the basis for granting summary judgment on this count.

failed to equip Officer Galpin with the skills necessary to properly recognize and respond to it.  (Pl.'s Opp. at 21.)

"Determining the reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72–73 (2d Cir. 2016) (internal quotations omitted). Taking the facts in the light most favorable to the nonmoving party, Plaintiff has offered evidence from which a reasonable factfinder could conclude that Mr. Reyes did not present an immediate threat to Officer Galpin because his actions were not directed at killing Officer Galpin, but rather at getting Officer Galpin to kill him. Moreover, jurors could also consider that Officer Koval responded differently to Mr. Reyes, mitigating the claimed exigency of Officer Galpin's circumstances.

However, whether Defendants failed to properly train Officer Galpin and whether Officer Galpin could have reasonably accommodated Mr. Reyes in a manner that may have avoided the fatal confrontation, summary judgment is nonetheless appropriate because Plaintiff failed to offer any evidence from which factfinders could conclude that training would have prevented the death of Daniel Reyes. Plaintiff offers no evidence what such training would have included or how it should have impacted Officer Galpin's actions. While Plaintiff's brief posits ways in which Officer Galpin's actions inappropriately escalated the situation, using Officer Koval's behavior to demonstrate how Officer Galpin should have responded, the record contains no evidence to connect Officer Koval's behavior to proper training. Plaintiff offers no training records or testimony about training content addressing how to accommodate mentally ill individuals under these circumstances and whether training explained Officer Koval's response to Mr. Reyes. Even if Officer Koval's conduct is evidence that Mr. Reyes could have been reasonably accommodated, his levelheaded policing could well have been due to his personality or years of experience in the field, unrelated to the specialized training that Officer Galpin lacked. No deposition testimony of

Officer Koval, Officer Galpin, or then Chief Campbell was offered as part of this record which could supply a legally sufficient nexus between Officer Galpin's lack of training and his actions that resulted in the death of Daniel Reyes. Accordingly, summary judgment in favor of the Defendants will be granted on this Count. Given that Defendants' motion is granted on these grounds, the Court does not reach the issue of intentional discrimination under Title II of the ADA.

### B. Count Two: Failure to Train under § 1983.

Defendants move for summary judgment on Count Two because Plaintiff failed to offer sufficient evidence that "action pursuant to official municipal policy" was responsible for Mr. Reyes's fatal injuries. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). A plaintiff seeking to impose municipal liability on a failure-to-train theory must prove that the municipality was deliberately indifferent to a particular omission in their training program that resulted in a pattern of constitutional violations. *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (granting summary judgment to the municipality because the reversal of four judgments due to *Brady* violations did not constitute a pattern of unconstitutional behavior such that the municipality was on sufficient notice of an omission in its training program); *see also Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397 (1997) (finding that a decisionmaker's failure to properly screen one applicant did not amount to the "pattern of injuries" required for a failure-to-train claim under § 1983). This threshold "pattern of similar *constitutional* violations" is required before the municipality can be required to modify its training program to prevent future constitutional violations. *Connick*, 563 U.S. at 62 (emphasis added). Defendant alleges that, even taking the facts in the light most favorable to Plaintiff, no reasonable jury could find that the Town of Thomaston

exhibited a pattern of unconstitutional behavior that would put them on sufficient notice under § 1983.

Defendants point to Chief Madden's deposition in which he states that there have not been any federal, state, or administrative complaints to any administrative agency in which Thomaston police officers have been found to have used excessive force or otherwise violated the constitutional rights of "emotionally disturbed or disabled person(s)." (Ex. H (Dep. of Chief Madden) to Defs.' Mot. Summ. J. [Doc. # 33-10] at 4-5.) Additionally, Madden represents that there were no other officer-involved shooting deaths in the course of his twenty-four-year career with the Town of Thomaston. (*Id.* at 14-15.) Plaintiff offers no evidence to demonstrate the contrary, nor offers any additional evidence to suggest that such a pattern of constitutional violations exists.  Therefore, Defendants' Motion for Summary Judgment as to Count Two is granted.

### IV. Conclusion

While Plaintiff was unable to demonstrate a pattern of unconstitutional behavior under § 1983, Plaintiff has offered sufficient evidence for reasonable jurors to conclude that the Town of Thomaston violated the ADA by failing to properly train its police officers. However, Plaintiff failed to offer sufficient evidence that the lack of training caused Daniel Reyes's death. For the foregoing reasons, the Court GRANTS Defendants' Motions for Summary Judgment on Count Three and Count Two.

The Clerk is directed to enter judgment for the Defendants on Counts Two and Three and to close the case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of September 2020.

15